UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| FORTIS BANK (Nederland) N.V. )  <br>     Plaintiff )  <br> and )  <br> )  <br> MASSACHUSETTS PORT AUTHORITY, )  <br> ET AL. )  <br>     Intervenor Plaintiffs )  <br> )  <br> v. ) <br> ) <br> M/V SHAMROCK and COPROPRIÉTÉ ) <br> DU NAVIRE SHAMROCK, ) <br>     Defendants ) <br> and ) <br> ) <br> COMATRANS, S.A., SP CONTAINER ) <br> LINE SA and SNC SHAMROCK GESTION ) <br>     Parties-in-Interest ) <br> and ) <br> ) <br> SPM LINE, INC. and CANSHIP ) <br> UGLAND, LTD. ) <br>     Third-Party Defendants ) | Docket No. 04-CV-147-GZS |

**ORDER ON MOTIONS FOR SUMMARY JUDGMENT**

Before the Court are Plaintiff Fortis Bank's ("Fortis") Motion for Summary Judgment (Docket # 286), Intervenor Plaintiff Republic of France Establissment National Des Invalides Del La Marine's ("ENIM") Motion for Summary Judgment (Docket # 353) and Plaintiff Fortis' Cross-Motion for Summary Judgment (Docket # 372), which Fortis filed in response to ENIM's Motion.

**I.  STANDARD OF REVIEW**

In deciding all of these pending motions for summary judgment, the Court applies the same basic standard. Generally, a party is entitled to summary judgment if, on the record before the Court, it appears "that there is no genuine issue as to any material fact and that the moving

party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). An issue is "genuine" if it could be resolved in favor of the nonmoving party by a rational fact finder drawing reasonable inferences. See, e.g., Ward v. Mass. Health Research Inst., 209 F.3d 29, 32 (1st Cir.2000). A disputed fact is "material" if it "has the potential to change the outcome of the suit under governing law if the dispute over it is resolved favorably to the nonmovant." Navarro v. Pfizer Corp., 261 F.3d 90, 93-94 (1st Cir. 2001) (quoting McCarthy v. Northwest Airlines, Inc., 56 F.3d 313, 315 (1st Cir. 1995).).

In this District, the Court constructs the factual narrative for purposes of resolving a motion for summary judgment via its review of the statement of material facts, which the moving party is required to submit pursuant to Local Rule 56(b). In accordance with this Local Rule, "facts contained in a supporting . . . statement of material facts, if supported by record citations as required by this rule, shall be deemed admitted unless properly controverted." D. Me. Local Rule 56(f).

## II. PLAINTIFF FORTIS BANK'S MOTION FOR SUMMARY JUDGMENT (Docket # 286)

Plaintiff Fortis Bank filed its initial motion for summary judgment on February 11, 2005 ("Fortis' Initial Motion for Summary Judgment"). Two limited objections were filed in response: one by ENIM (Docket # 309) and another by a group of intervenors referred to as the "Boston Parties" (Docket # 311).[1] In its reply to these objections, Fortis clarified that through this Motion for Summary Judgment it was simply asking the Court to resolve the following legal question: Does Fortis hold a preferred mortgage lien that may be enforced against the M/V

---

[1] The Boston Parties have since settled all of their claims thereby mooting their limited objection to the pending Motion for Summary Judgment.

Shamrock pursuant to the terms of 46 U.S.C. § 31326?[2] As explained below, the answer to this question is, quite simply, yes. Therefore, the Court GRANTS Fortis' Initial Motion for Summary Judgment.

### A. Factual Background

Notably, none of the limited objections filed to the pending Motion for Summary Judgment included any opposition to the Statement of Material Facts submitted by Fortis (Docket # 287). Thus, the Court deems the facts contained within this Statement of Material Facts admitted. For purposes of resolving the question presented by the pending motion, the Court recounts the following pertinent undisputed facts:

On December 31, 1998, MeesPierson N.V., a Dutch banking corporation that later merged with Fortis Bank, entered into a loan agreement ("Loan Agreement") with Defaulted Defendant Copropriété de Navire Shamrock ("Copropriété"). Pursuant to the Loan Agreement, Copropriété borrowed $11.6 million (USD) for the construction and acquisition of the M/V Shamrock. In 2000, Fortis merged with MeesPerson N.V. and became the successor in interest under the Loan Agreement. One of the security documents required under the Loan Agreement was a mortgage on the M/V Shamrock. On December 20, 2000, Copropriété executed a mortgage on the M/V Shamrock in favor of Fortis.

This mortgage was executed in French. Because the M/V Shamrock was a French-flagged ship with a port of registry at Saint Pierre et Miquelon, Republic of France, the mortgage was registered by the Conservateur des Hypothèques Maritimes (Register of Maritime

---

[2] In fact, Fortis' Motion for Summary Judgment had also included a request that the Court grant judgment in its favor on the counterclaims that had been filed by the Shamrock Defendants. However, the Court dismissed with prejudice any such counterclaims on March 15, 2005. (See March 15, 2005 Order (Docket # 321).) Thus, this portion of Fortis' Motion for Summary Judgment was moot by the time Fortis filed its reply.

Mortgages) at the Service des Douances, Conservation des Hypothèquea Martimes for Saint-Pierre et Miquelon, Republic of France. This registration took place on December 20, 2000.

By all accounts, Copropriété defaulted on its payments under the Loan Agreement in 2001. Although Fortis and Copropriété made attempts to rectify this default informally, Fortis ultimately sent Copropriété a default notice in March 2002. Although some payments did follow after the notice was sent, the payment default was never fully cured. On September 1, 2003, Copropriété informed Fortis that two entities involved in the financing of the M/V Shamrock had filed for receivership and were to be liquidated. Under the terms of the Loan Agreement, these developments represented additional default events. In late December 2003, Fortis sent Copropriété a second default notice citing both the payment default and the bankruptcy of one of the M/V Shamrock's associated entities. This notice was ultimately received by Copropriété on or about January 26, 2004.

As of July 5, 2004, Copropriété remained in default with the amount owed to Fortis totaling $14,353,119.84 (USD). On July 9, 2004, Fortis sent an acceleration notice demanding payment of the entire amount owed. On that same date, Fortis filed this action and obtained a warrant for the arrest of the M/V Shamrock. Pursuant to that warrant, the M/V Shamrock was arrested in Portland Harbor on July 20, 2004. The Court subsequently ordered the interlocutory sale of the M/V Shamrock and, on November 12, 2004, the M/V Shamrock was sold for $11,050,000.00 (USD) at a public auction.

**B.    Discussion**

The Ship Mortgage Act, 46 U.S.C. §§ 31301-31343, allows for the enforcement of mortgages on foreign vessels via *in rem* admiralty actions. See 46 U.S.C. § 31325(b)(1). As

relevant to the pending motion for summary judgment, Section 31326 of the Ship Mortgage Act reads:

> (a) When a vessel is sold by order of a district court in a civil action in rem brought to enforce a preferred mortgage lien or a maritime lien, any claim in the vessel existing on the date of sale is terminated, including a possessory common law lien of which a person is deprived under section 31325(e)(2) of this title, and the vessel is sold free of all those claims.
>
> (b) Each of the claims terminated under subsection (a) of this section attaches, in the same amount and in accordance with their priorities to the proceeds of the sale, except that--
>
> (1) the preferred mortgage lien, including a preferred mortgage lien on a foreign vessel whose mortgage has been guaranteed under title XI of the Merchant Marine Act, 1936 (46 App. U.S.C. 1101 et seq.) has priority over all claims against the vessel (except for expenses and fees allowed by the court, costs imposed by the court, and preferred maritime liens); and
> (2) for a foreign vessel whose mortgage has not been guaranteed under title XI of that Act, the preferred mortgage lien is subordinate to a maritime lien for necessaries provided in the United States.

46 U.S.C. § 31326. For purposes of this statute, a "preferred mortgage" is defined, in relevant part, as "a mortgage, hypothecation, or similar charge that is established as a security on a foreign vessel if the mortgage, hypothecation, or similar charge was executed under the laws of the foreign country under whose laws the ownership of the vessel is documented and has been registered under those laws in a public register at the port of registry of the vessel or at a central office." 46 U.S.C. § 31301(6)(B).

In short, the undisputed facts clearly establish that Plaintiff Fortis Bank is the holder of a preferred mortgage on the M/V Shamrock and that Fortis is entitled to enforce its preferred mortgage lien pursuant to 46 U.S.C. § 31326. To the extent the Fortis' Initial Motion for Summary Judgment (Docket # 286) sought such a declaration, the Motion is GRANTED.

The net effect of the ruling on Fortis' Initial Motion for Summary Judgment is that Fortis' preferred mortgage lien is subordinate to only three other types of claims: (1) any

expenses, costs and fees allowed by the Court (also known as *in custodia legis* expenses), (2) preferred maritime liens as defined in 46 U.S.C. § 31301(5), and (3) maritime liens for necessaries provided in the United States.

### III. INTERVENOR PLAINTIFF ENIM'S MOTION FOR SUMMARY JUDGMENT (Docket # 353) and PLAINTIFF FORTIS BANK'S CROSS-MOTION FOR SUMMARY JUDGMENT (Docket # 372)

Intervenor Plaintiff ENIM filed its Motion for Summary Judgment on April 22, 2005. ENIM originally intervened in this case shortly before the public auction. As alleged in its Amended Complaint (Docket # 217), ENIM is a public administrative body created by the French Government that receives contributions from French crew members and their employers. These contributions are managed by ENIM and used to provide various benefits and pension payments to French crew members. Via its *in rem* claim against the M/V Shamrock, ENIM seeks to collect the contributions allegedly owed based on the wages earned by French crew members of the M/V Shamrock. In response to ENIM's motion, Fortis filed a cross-motion for summary judgment that essentially asks this Court to find that ENIM's claim is subordinate to Fortis' preferred mortgage lien.

#### A. Factual Background

Without repeating the undisputed background facts already set forth in connection with Fortis' initial summary judgment motion, the Court has gleaned the following additional undisputed material facts from the Statements of Material Fact, as well as the documents cited therein:

As the common social security regime for crew members enrolled in the French Merchant Marine, ENIM provides French crew members with health and life insurance coverage

as well as a pension. ENIM funds these benefits via compulsory contributions from both the crew member and the shipowner based on a percentage of the crew member's gross wages. The obligation to make contributions to ENIM arises from the employment contract between the shipowner and the crew member. The shipowner is then exclusively responsible for payment of both the crew member's contributions and the shipowner's contributions. ENIM has no recourse against individual crew members if the shipowner fails to pay ENIM the required contributions.

ENIM generally relies on the declarations of shipowners to calculate the periods of crew member employment and the resulting amount of the contribution owed to ENIM. In fact, in 2003 and 2004, either Comatrans or SPM Shipping filed declarations with ENIM listing the dates of employment for each of the French crew members of the M/V Shamrock.

Upon the arrest of the M/V Shamrock, the Court appointed National Maritime Service, Inc. ("NMS") as the substitute custodian of the M/V Shamrock. In this role, NMS managed and secured all of the services necessary to maintain the M/V Shamrock from July 20, 2004 through November 18, 2004. But for the appointment of NMS, the M/V Shamrock would have remained in the custody of the United States Marshals Service, which would have been responsible for maintaining and securing the M/V Shamrock during its period of arrest.

Neither the United States Marshals Service nor NMS were bound by any employment contracts that existed between crew members of the M/V Shamrock and Comatrans and/or SPM Shipping. In fact, those contracts were terminated when the M/V Shamrock was arrested on July 20, 2005. Nonetheless, in order to maintain the vessel, NMS continued to employ certain crew members of the M/V Shamrock. Ultimately, NMS sought and received approval for all of the expenses incurred as the substitute custodian of the M/V Shamrock. These expenses included the wages paid to crew members for work performed to maintain the M/V Shamrock while the

vessel was under arrest. Although NMS paid the crew members directly for their work, it did not make any contributions to ENIM. For its part, ENIM has not asserted that it is owed contributions from either NMS or the United States Marshals Service.

### B. Discussion

#### 1. The Choice of Law Question

ENIM asks the Court to apply French law in determining whether it may recover its compulsory contributions from the proceeds of the sale of the M/V Shamrock. In support of their argument, ENIM cites to the mortgage documents signed by Fortis, which include an unqualified choice of French law. The parties agree that under French law ENIM's claim would share the same priority as a crew wage lien and, thereby, be superior to Fortis' preferred mortgage. (See Nicolas Aff. (Att. to Docket # 370) ¶ 6.) However, Fortis argues that in the context of this action the priority of claims is determined via application of the Ship Mortgage Act, 46 U.S.C. §§ 31301-31343, rather than French law.

Precedent clearly supports Fortis' argument. See Payne v. SS Tropic Breeze, 423 F.2d 236, 238-39 (1st Cir. 1970), *cert. denied*, 400 U.S. 964 (1970). In Payne, the First Circuit held that when vessels were arrested in the United States the Ship Mortgage Act exclusively governed any questions regarding the relative priority of maritime liens and preferred mortgages. Although the Ship Mortgage Act has undergone revisions since the Payne decision, these amendments do not affect the reasoning or precedential value of Payne. See, e.g., Oil Shipping (Bunkering) B.V. v. Royal Bank of Scotland, 817 F. Supp. 1254, 1262 (E.D. Pa. 1993), *aff'd*, 10 F.3d 1015 (3d Cir. 1993). Thus, the Court must resolve the dispute regarding the priority of ENIM's claim for compulsory contributions by applying the provisions of the Ship Mortgage Act.

Presumably anticipating this holding, ENIM presents two arguments that its claim for compulsory contributions precedes Fortis' preferred mortgage under the provisions of the Ship Mortgage Act. First, ENIM seeks contributions on the wages paid by the substitute custodian from July 20, 2004 through November 18, 2004 on the grounds that the contributions allegedly owed for this period should be deemed *in custodia legis* expenses. Second, ENIM suggests that the contributions it seeks are crew wages thereby giving rise to a preferred maritime lien. As explained below, neither of these arguments holds water.

### 2. ENIM Contributions Do Not Qualify as *In Custodia Legis* Expenses

In general, *in custodia legis* expenses are given the very highest priority when distributing the proceeds from the sale of a vessel. "In order to qualify for preferential treatment as an expense *in custodia legis,* an expense must be incurred 'upon the authority of the court or its officer,' and be 'for the common benefit of those interested in [the] fund.'" Oil Shipping (Bunkering) B.V. v. Sonmez Denizcilik Ve Ticaret A.S., 10 F.3d 176, 182 (3d Cir. 1993) (internal citations omitted). In short, the unquantified but relatively small sum[3] now sought by ENIM as *in custodia legis* expenses does not meet these qualifications.

There is no evidence on the record that ENIM ever notified the Court, the United States Marshals Service or NMS that it believed contributions were due as result of NMS' decision to employ various crew members of the M/V Shamrock to maintain the vessel. In addition to its failure to provide any notice to an entity that had the authority to approve ENIM contributions,

---

[3] ENIM has acknowledged that "only those expenses for services or property furnished [to a vessel] after its seizure by the U.S. Marshal . . . can be considered to have been incurred while the vessel was in custodia legis." (ENIM's Mem. of Law in Partial Opp. to Joint Mot. for Disbursement of In Custodia Legis Costs (Docket # 294) at 3 (quoting United States v. M/V Andoris, 570 F. Supp. 413, 416 (E.D. La. 1983)).) Thus, ENIM's *in custodia legis* theory of recovery covers only the time period from July 20, 2004 through November 18, 2004. In connection with the pending motion, ENIM has not even attempted to quantify how much of the total amount they are seeking falls under this theory; however, Fortis represents that the total amount "does not exceed $27,000." (Pl.'s Reply to Opp. to Cross-Mot. for Summ. J. (Docket # 376) at 3 n.1.)

the Court notes ENIM repeatedly failed to object to the wage payments that were being brought to the attention of the Court and subsequently approved as *in custodia legis* expenses. Specifically, ENIM did not object to any of NMS' submissions outlining the expenses it was incurring while the M/V Shamrock was under arrest. (See, e.g., Notice of Substitute Custodian's Costs to Date (Docket # 222).) Notably, these submissions reflect payments to crew members but no payments to ENIM.

In addition, on February 2, 2005, Fortis Bank and NMS filed their Joint Motion for Immediate Disbursement of *In Custodia Legis* Costs (Docket # 277), which provided a complete accounting of all of the expenses incurred in keeping the M/V Shamrock safe and secure for the period it was under arrest. On February 23, 2005, ENIM filed a limited objection to this motion (Docket # 294) objecting only to an insurance policy Fortis had obtained. By failing to include in this objection any reference to the alleged inadequacy of the wages disbursed during the period of the arrest or otherwise filing a separate motion seeking reimbursement of additional *in custodia legis* expenses, ENIM arguably waived any objection to the custodia legis costs subsequently approved by the Court.

Putting aside for the moment the procedural question of waiver, ENIM's silence during the period of arrest means that any contributions that accrued during the arrest period were not incurred upon the authority of the Court or its officer. Because ENIM contributions were not "necessary to preserve the value of the res," ENIM should have sought explicit approval from the Court for the payment of such contributions.[4] Oil Shipping (Bunkering) B.V., 10 F.3d at 182-83.

---

[4] The Court notes that under different circumstances such payments to preserve benefits might be deemed necessary to the preservation of the vessel. However, in this case, there is no evidence that the crew members employed by NMS during the arrest period demanded such payments in order to do the work necessary to preserve the M/V Shamrock.

10

Absent such approval, ENIM acted at its peril in silently assuming that the Court would later find these contributions qualified for payment as *in custodia legis* expenses. See id. at 181.

ENIM's argument that the previous approval of wages as *in custodia legis* expenses included an implicit approval of ENIM contributions is simply without merit. Without any notice that ENIM believed it was entitled to collect contributions on wages paid to any French crew member who was employed by NMS, neither the Court nor Fortis had any reason to believe that by simply approving or consenting to the payment of crew wages they were implicitly agreeing to pay compulsory contributions to ENIM in order to protect and preserve the M/V Shamrock while in the custody of the United States Marshal.

In short, the ENIM contributions belatedly sought as *in custodia legis expenses* were neither necessary nor incurred with proper approval of the Court.[5] Although the Court recognizes that in its discretion it could still award these contributions preferred status as *in custodia legis* expenses upon a finding that "equity and good conscience" so require, it declines to do so on the facts and arguments presented. New York Dock Co. v. Poznan, 274 U.S. 117, 122 (1927).

### 3.     ENIM Contributions Do Not Constitute Crew Wages

Finally, the Court addresses head-on the parties' disagreement regarding whether ENIM contributions are, in fact, part of the wages owed to the crew of the vessel. Under the Ship Mortgage Act, Fortis' preferred mortgage is subordinate to the wages owed to the crew of the

---

[5] In light of this holding, the Court need not resolve the apparent dispute regarding whether contributions were, in fact, incurred. Suffice it to say that, on the current record, it is not clear that the employment contracts entered into between NMS and any members of the French merchant marine on or after July 20, 2005 gave rise to any obligation to make compulsory contributions to ENIM. Moreover, there remains another dispute regarding whether the M/V Shamrock was or should have been considered an inactive vessel for purposes of ENIM contributions during all or some portion of its period of arrest.

M/V Shamrock.[6]  See 46 U.S.C. §§ 31301(5)(D) & 31326(b).  Thus, if ENIM could establish that the contributions it seeks are, in fact, crew wages, ENIM would have a preferred maritime lien that would be of higher priority than Fortis' preferred mortgage.[7]

ENIM primarily and problematically relies on French law in arguing that the contributions it is owed should be treated as crew wages.  Of course, the Court has already ruled that the priority of claims issue raised by the *in rem* claims in the case are to be decided under the Ship Mortgage Act rather than French law.  Nonetheless, ENIM's repeated references to French law appear to suggest that the Court could somehow utilize the Ship Mortgage Act to determine priority and yet, in the context of this case, determine the contours of the phrase "wages of the crew of the vessel" by relying on French law.  However, the Court cannot adopt such an idiosyncratic view of statutory terms.  Rather, in order to achieve the Ship Mortgage Act's purpose and promote uniform application of the Act, the Court must seek out the singular definition of the statutory phrase that can then be applied to multiple cases.

The Ship Mortgage Act does not contain a explicit definition of what constitutes the "wages of the crew of the vessel."  46 U.S.C. §§ 31301(5)(D).  However, the plain language of the phrase does not suggest that term necessarily includes additional contributions owed to third parties or any other withholdings.  Cf. Kesserling v. F/T Artic Hero, No. A90-492, 1993 U.S. Dist. LEXIS 5782 at *2 (D. Alaska April 16, 1993) (holding that the United States Marshal was

---

[6] In fact, pursuant to a settlement, the crew, including those crew members who are enrolled in the French merchant marine, has already received a lump sum payment from the proceeds of the auction.  (See Order & Finding for Separate and Final Judgment (Docket # 366) & May 2, 2005 Judgment (Docket # 367).)

[7] Notably, it is well settled that a maritime lien cannot be created for services rendered after the arrest of the vessel.  See, e.g., Oil Shipping (Bunkering) B.V., 817 F. Supp. at 1259-60; see also Thomas J. Schoenbaum, Admiralty & Maritime Law § 9-1 (4th ed. 2004) ("When a vessel is 'under arrest' *in custodia legis*, expenses and costs incurred cannot create a maritime lien.")  Thus, to the extent ENIM argues that a preferred maritime lien exists for unpaid contributions, such a lien would only cover contributions owed to ENIM prior to July 20, 2004.

responsible for paying any payroll taxes due on the wages paid to eighty-six seamen who worked on a vessel while it was under arrest). Rather, "wages" more commonly refers to the compensation that is delivered from an employer to an individual employee.

Moreover, the overwhelming majority of courts that have been asked to enforce a preferred maritime lien for outstanding contributions owed to third parties for the funding of pension-type plans have held that these contributions are not crew wages. See, e.g., Banco de Credito Industrial, S.A. v. Tesoreria General de la Seguridad Social de Espana, 990 F.2d 827, 837 (5th Cir. 1993) ("Unpaid social insurance or pension contributions are not "wages of the crew" because they are due to a third party vicariously through the seamen's labors; the seamen themselves have no claim to their employer's contributions."); Prudential Ins. v. United States Lines, Inc., 915 F.2d 411, 412 (collecting cases that "address[ed] employer contributions to pension-type benefit plans" and ultimately "concluded that such contributions are not 'wages of the crew'"); Citibank N.A. v. Vessel American Maine, No. 87 Civ. 7207 (JFK), 1988 WL 61821 at *2 (S.D.N.Y. June 6, 1988) (collecting cases). Following these cases, the Court declines to find that the contributions allegedly owed to ENIM are crew wages entitled to priority as a preferred maritime lien.

Having found that ENIM's claim for compulsory contributions does not qualify as an *in custodia legis* expense or otherwise qualify as a preferred maritime lien for the recovery of crew wages, the Court concludes that ENIM's *in rem* claim is subordinate to the preferred mortgage of Fortis Bank. On this basis, the Court GRANTS summary judgment in favor of Plaintiff Fortis Bank.

## IV. CONCLUSION

For the reasons explained herein, the Court GRANTS Fortis' Initial Motion for Summary Judgment (Docket # 286). The Court also DENIES ENIM's Motion for Summary Judgment

(Docket # 353) and GRANTS Fortis' Cross-Motion for Summary Judgment (Docket # 372). As a result of this latter ruling, the Court orders that judgment be entered in favor of the M/V Shamrock on ENIM's *in rem* claim.

SO ORDERED.

/s/ George Z. Singal
Chief U.S. District Judge

Dated this 29th day of July 2005.